Donald Anderson is here for Appellate Elkin King. Michael Buckler is here for Appalachia Forrest King. And Mr. Anderson, you may begin when you're ready. Thank you. May it please the court, my name is Donald Anderson. I represent Elkin King, who is the appellant and the plaintiff in the case below. As a preliminary matter, before I start the argument, the clerk has asked me to advise the panel that plaintiff appellant has provided copies of two additional cases that were not cited in the brief, but which I'd like to refer to an oral argument. Pursuant to the Eleventh Circuit rules, I've provided copies of these cases to opposing counsel and also have provided copies to the panel. For reference, those cases are McKay v. Rainey, which is a Georgia Court of Appeals case, and also an Eleventh Circuit decision in Amergy Bank v. Deutsche Bank, so those cases are . . . I haven't read them yet, but when were those cases decided? The McKay v. Rainey case, I think, was 2018 and the . . . 2017. 2017, beg your pardon, Judge Branch. I think the Amergy Bank case was decided in 2015, I believe. Well, weren't those cases cited in the brief? No, Your Honor, they're not. They're cases that are located after the briefs were filed. Supplemental authority is intended to bring to the attention of the Court authority that was decided after the briefs were filed, so the cases should have been in the briefs. It's kind of hard for us to . . . We've got the cases on the morning of oral argument. It's hard for us to be prepared for the argument, having read those cases. Yes, Your Honor, I understand. Thank you. What is the gist of what they hold? Well, Judge, both of those are cases . . . Our principal argument in this case is whether there's a breach of a fiduciary duty or not is a question of fact for the jury and the McKay v. Rainey case is a Georgia Court of Appeals case on that . . . Your argument is that he became a fiduciary once King got the money . . . Yes, Your Honor. . . . into the account. Exactly. That's exactly right. That's what the McKay v. Rainey, it's Georgia law relating to whether that's an issue of material fact for the jury. The Amergy Bank case is slightly different. It involves a stockbroker who is an intermediary and not a fiduciary, but it also involves the duty of that person in the handling of those funds. Whether that's a genuine issue of material . . . was an issue which the jury could have considered in that case. It was not a summary judgment case. It was a case involving an appeal from a jury verdict and the Eleventh Circuit ruled that there was evidence sufficient to support the jury's verdict. Judge, may it please the Court, the issue on appeal is whether the summary judgment was properly entered against the plaintiff and whether there was a denial of the plaintiff's motion for partial summary judgment on the issue of liability. The issue essentially is whether the district court erred in granting summary judgment on the grounds that there were no genuine issues of material fact that should go to the jury in this case. With the Court's indulgence, I'd like to put the factual issues in this case in context because the facts are pertinent as to how Dr. King came into possession of the funds and the background of the case and who the parties are. Let me ask you on the facts. Let me focus your attention on one. Just assuming there's a dispute of fact as to whether the Schwab account was retitled in Peggy Fulford's name after the divorce, what is your best authority for the proposition that this is a material issue of fact? My concern is we have . . . this is summary judgment. We have affidavits saying that the settlement funds went with Peggy as part of the divorce agreement and your client hasn't put forward any evidence disputing that fact. Is a dispute over who was nominally on the account post-divorce material for purposes of a breach of fiduciary duty and conversion? Your Honor, I believe it is. Even though Peggy . . . all the evidence seems to suggest that Peggy had complete control over this account post-divorce? Your Honor, if I may, there is evidence to the contrary. There is evidence that Dr. King continued to exercise or have the right to control that account after the divorce. Dr. King in his deposition testified that after the divorce that he did not have any recollection the funds were ever . . . or the account was ever retitled. I don't think Ms. King ever testified that the account was retitled. So there's evidence . . . Your Honor, I have a hard time understanding the difference a divorce would make. As I understand the facts, the money went to Dr. King. They were still married. He deposited it basically for the use and benefit of Elton. And then there was a divorce and he gave the money back. But he had a fiduciary responsibility when he . . . well, at that time. Your Honor, if I may, there are two issues, two things there. Isn't that your position though? No, Your Honor. Our position essentially is that Dr. King never gave the money back. Well, then she took it. But the point I'm making here, however the money got turned back, he had the responsibility over it. Yes, Your Honor. That's correct. He did have the responsibility. And our argument also is that when the remaining funds in the account were used in, I think, 2002, I believe it was, my client Elkin King had turned 18 years of age years earlier. Essentially, our argument is that under Georgia law, the only right that anyone had to hold Elkin King's funds were because he was a minor. And when he ceased to be a minor at the age of 18, when he was a senior in high school at North Springs High School in Atlanta, at that point, the existence of the fund should have been disclosed to him. And at that time, because he was no longer a minor, there was no further right. Let me tell you my concern though, with regard to Georgia law. Yes, Your Honor. The Georgia wrongful death statute, there's nothing in that statute that requires that a minor's award be held in trust until the age of majority, or that it not be used for the minor's benefit by his legal guardian. Nothing in the Georgia wrongful death statute that says the money has to be held in trust until the minor reaches the age of 18. Isn't that correct? Your Honor, the statute is broad. The statute says that the parent can bring the wrongful death action for the benefit of the minor children. And that broad description of the purpose for which the wrongful death action is brought carries with it the obligation that the parent is also going to hold those funds for the benefit of the minor. We cited two cases in our brief, Your Honor. Is that what the settlement terms provide it? You got to hold the money until he gets to be 18? Because there's no settlement terms in this record. Judge, and this is the dilemma that my client Elkin King faces. My client was not aware of the existence of a settlement until, I think we said, 2017, when his mother told him about the funds and the settlement and the funds. He inquired, I inquired, back to the Swift Curry McGee firm. Glover McGee was the lawyer that represented Ms. King in the underlying wrongful death case. Glover McGee died years ago. Mike Schroeder, who was his partner in my classmate in law school, at Swift Curry said, we don't have any records of that case any longer. The existence of that settlement agreement is nowhere to be found. What we do know is that we have Ms. King telling Elkin that the funds were given to her husband, Dr. King, and put in a Charles Schwab account. Ms. King confirmed that, as she said in her deposition to me, prior to the filing of the suit. So we knew two things. One, there was a settlement. Two, the money went in Dr. King's Charles Schwab account. We filed the suit. We took the suit. Number three is the money was used for his private school, for his cars, and for his housing. So the money was used for its benefit. The money was used for him. The money was spent on him. Your Honor, if I may, all of those issues are genuine issues of material fact. The question of whether the money was actually spent on him involves questions of material fact. We've gone through, in our brief, we've outlined each of the cases. So your position is the money was not used for his private school, for his cars, and for his housing? That's correct, Your Honor. That is our position. Our position is that those are disputed facts. We lay it out in our brief of the appellee. But if you add up all of the items that Judge Wilson just mentioned, that dollar amount would exceed the dollar amount of the funds that were deposited into the account, correct? That dollar amount would exceed it, but that's a disputed dollar amount. Elkin King says, I grew up in New Orleans with my maternal grandparents. I did not live with Dr. King. My maternal grandfather paid my schooling when I was in elementary school. My uncle paid my schooling at De La Salle High School. Until he turned 18, when he was a senior at North Springs High School and would have been entitled to the funds, Elkin King was not provided for by Dr. King. And what's more, Peggy King received monthly Social Security payments, which were sent to the maternal grandparents to provide for him. So the question of whether all of these funds that Dr. King now claims were spent on schooling and on cars, et cetera, those are clearly disputed facts, and all of that's set forth in the record. So we've got, I mean, there's testimony in the record from his mother that the money was used for his benefit. There is, and there's also testimony from Elkin King that the money was not spent for that. It describes his schooling. It describes who paid for his elementary school, who paid for his high school. Both the affidavit of Elkin King and the deposition of Elkin King all describe that. Their argument also is made that these cars that are cumulatively added, like $20,000 for this one and then $20,000 for that one, I'm using broad numbers, those cars were traded in. You can't just add all those numbers and say, well, we just bought like three cars, and therefore we put that total in there. That total is, with all due respect, replete with genuine issues and material facts. I would note that there is undisputed testimony from his mother, Peggy Fulford, that she was exercising control over the funds in this account, and I think there was a condo purchased at the end, but she is not a defendant here. Isn't that a problem for you if we find that, in fact, there may have been, these funds might not have been used for his benefit, but if we find that Peggy had the control post-divorce, the fact that she's not a defendant, isn't that fatal to this claim? Again, with all due respect, Your Honor, the question of control of the funds is a genuine issue of material fact. We know Dr. King had the account in his name. He testified in his deposition. It was Elkin's account by Forrest King Custodian. There's testimony from Ms. King that Glover McGee gave the money to Dr. King because Dr. King was a responsible person. Dr. King became a fiduciary, and once he became a fiduciary, he had two obligations. One, to disclose the funds when Elkin became 18, and two, to make sure that they were properly used. So he can't cede that fiduciary obligation to Ms. King. And the argument that she controlled the funds, Dr. King said he couldn't even remember whether she had the right to write checks or withdraw funds from the account. So that, in and of itself, creates an issue of fact as to what control that she actually was able to exercise, much less creating an issue of fact that somehow exculpates Dr. King from his responsibilities that he undertook as a custodian. All right. We'll keep all your rebuttal time, Mr. Anderson. Thank you, Your Honor. Counsel. May it please the court. My name is Michael Fackler with the law firm here in town of Milam, Howard, and Kandrean-Gillum. With me is Mr. John Chernesky. We represent the defendant, appellee Dr. Forrest King. The court should affirm the summary judgment below. There was no disputed issue of fact as to who controlled the funds, what the funds were used for, and how much were used, all of which show that the funds were properly used per the trust instructions for Elkin King's benefit. There's no evidence that Dr. King breached that agreement, breached his duty. There might be evidence that Ms. Fulford breached that duty in 2005 when she purchased the condominium. But at that point, the money had been turned over. So let me just talk real quickly about some of the facts. I think you have a pretty good grasp. But from our perspective, the only thing I would add is the money was put into an account. It did have Dr. King's name on it. The directions from the attorney were, use this funds for Elkin King's benefit. No instructions to turn it over at a certain time. No instructions. But the law required that, it seems to me. He's a fiduciary, and the law required when he became an adult to turn it over. Your Honor, we don't have any. Unless Georgia law would carry the fiduciary relationship forever. Your Honor, our instructions were to use the funds for his benefit with no limitation on the time. There's Georgia cases that talk about trust extending beyond 18. If you were on the other side of the case, what would your argument be about how the funds were used? If I were on the other side? Yeah. What's their best case on the funds were not used, or there is a dispute about the funds being used for the child? There are two small issues and one larger issue. The larger issue is the condominium purchased in 2005 by Peggy Fulford. And I addressed that. That's long after he's an adult. Exactly. It is long after he's an adult, and it's long after Dr. King turned over. About while he was a minor. What is the best evidence they've got that there's a fact issue on how the money was spent? There is no direct evidence that Dr. King. Well, I'm talking about circumstantial evidence. Yes, Your Honor. That they used it improperly. The way they get to the circumstantial evidence is to attack the specific recitations of how the money was used. And for example, we heard about the private elementary school in New Orleans. There is a disputed issue of fact as to that one. And Judge Davis recognized that in the footnote and said that was immaterial. And we're not including that in the total, which does exceed the amount of the funds. There's another dispute about De La Salle High School, which was for $5,000. And my client and Ms. Fulford testified that they used funds for $5,000. The evidence and circumstantial evidence to the contrary is Elkin King saying, the exact language was, I was under the impression, I assumed that my father paid, I'm sorry, my uncle paid for that. Not competent knowledge based on his own personal knowledge. He was under the imposition and assumed. My client provided direct testimony that they paid. And so there are some disputes like that that aren't supported by direct evidence. The other is legal fees for an attorney. This was after he did reach the age of majority. But my client testified they spent approximately $20,000 for an attorney to deal with a legal question. Elkin King testified that he was charged $3,000 by his cousin for that. But in that same testimony, Elkin King says that, I don't even know who paid the bill. I assume it was Ms. Fulford and Dr. King who paid the bill. He doesn't know who paid the bill. He certainly can't testify as to how much he was charged. He wasn't charged anything. Maybe he heard something in hearsay, but that's not competent substantial evidence to refute the knowledge that my client has put in depositions and the affidavits submitted by Ms. Fulford and the deposition of Ms. Fulford. It's important to note, Your Honor, we've talked a bit about Ms. Fulford. Judge Branch had a question about Ms. Fulford. There is no allegation in the complaint that my client is liable for the actions of the co-trustee. Allegations in the complaint are that my client breached his duties. Not that he's liable for Ms. Fulford's actions, but that he breached the duty. And so there's no evidence regarding why he's liable. There's no facts to support why he would be liable for Ms. Fulford's actions. And there's no dispute that Ms. Fulford, in fact, committed those actions. So going back, if I could, to, there are two counts that were brought. A conversion count and a breach of fiduciary duty. For the conversion count, on count one, we don't think there's any dispute. There's no evidence to support that my client converted any funds, which under Georgia law is a wrongfully asserted control over another's money. And the evidence is that Peggy Fulford used the funds consistent with the directions provided to her and to Dr. King. And that's not inconsistent with Elkin King's rights. Does Georgia law provide that the account needed to be turned over to Elkin King when he reached 18? We can find no support for that in Georgia law. And the terms of the trust did not provide for that. The terms of the trust did not provide it. There is a case of Hayes, which is cited in the briefs, Your Honor, which did require the funds be turned over to 18. That was pursuant to an express trust. The settlement agreement was entered into New Jersey, required the mother to hold and not spend the funds until the daughter was 18. You have to anticipate what the Georgia Supreme Court would hold. Yes, Your Honor. And it's- I speak for myself. It seems to me, as a matter of common sense, that a trustee is holding the money for a minor. When the minor becomes an adult, it belongs to the minor. It shouldn't be turned over to the minor, because the trustee no longer has any responsibility. I understand that position, Your Honor, in two things. One is, under the terms of this trust, without specific direction, Dr. King and Ms. Fulford had no way of knowing what the Georgia Supreme Court might do. And now to hold them liable for actions that were done 30 years earlier with directions to hold the funds, not hold the funds, excuse me, to use the funds for Elkins' benefit, they carried out that duty faithfully. And then to come back and say, hey, the duty was to turn it over at 18 is, in my opinion, not fair to my clients, who had no knowledge but followed the terms of the trust as they understood them. And there's no dispute as to what the terms of the trust are. Do we know what the account balance was when he was 18? We do not, Your Honor. And we did discovery. We looked for Charles Schwab. The documents did not go. There were no documents. There were no documents, Your Honor, no documents at all. How old was he when the condo was purchased? How old was he? He was born in 78. So he was, quick math, 28? 28. One more point about turning over the documents 18. Did he live in the condo? He did, Your Honor. It was purchased in early 05. He lived there until Katrina in August of 05, and then returned there in 06 and 07. His testimony was he did not pay rent for the condo, but he lived there in the condo with others, admittedly. His, I think, stepbrother and a few others. Going back to the point of the duty to turn over funds at 18, that is not an allegation that we're accused of in the complaint. The complaint accuses and alleges that we had a duty, we breached a duty to use the funds properly, to account the funds, and preserve the funds. That's paragraph 19 of the amended complaint. There's no allegation. It's not the claim that we failed to turn the money over when he reached the age of majority. So yes, I see, Judge Soflite, your concern about what happens at that point, but that was not part of the complaint and what we were accused of not doing. That morphed at some point, and when we got to where we are now, it's now the claim that we should have turned it over at 18. That's not what the amended complaint asserts. So going back to the conversion, we don't think there's any facts to support it. I will admit, candidly, Judge Soflite, if you are correct that there is a duty to turn it over at 18, then that's problematic for my client. Because at 18, he still had control of the funds, and if he had a duty, unbeknownst to him, to turn it over, then perhaps there is a conversion claim below. We've talked briefly about what the evidence is and what duty is required, and that's an important part of the second count, which is breach of fiduciary duty. First step is to determine what is the duty, and we've talked about it. We have a weak record because it all happened in 1990 or so. The evidence is undisputed from Ms. Fulford and Dr. King that their instructions were to use the money for Elkin benefit. Again, no evidence that it had to be turned over at 18, 21, finish college, no evidence to when it would terminate. And so with those of the duties of what we think are the express thrust, or the express terms to the extent they were expressed to us, appellant seeks to add additional terms that are A, not in the complaint, and B, not supported by Georgia law or by the express terms. And the first is the duty to disclose, and that's important for two reasons, Your Honor. We admit under the Goldstein case versus Bank of America, that told the statute of limitations. There's a genuine issue of material factors as to whether the trust was disclosed, but we recognize that there is a genuine issue. But even with the tolling of the statute of limitations, there are two reasons why summary judgment must still be affirmed. First, Elkin King did not allege a breach of the duty to disclose. There is a reference to a failure to disclose, but in count two, paragraph 19, that's not one of the duties we allegedly breached. And it's not the duty of the trial court or the appellate court to create a claim which the appellant has not spelled  We cite to Manasseh versus Brown for that proposition. And then the second reason the duty to disclose doesn't survive summary judgment is there's no damages flowing from the duty to disclose. Elements of a breach of fiduciary duty under Georgia law, Ray versus Hardaway, fiduciary duty, breach of that duty, and damages. So Elkin King argues the breach of duty to disclose led to damages because Elkin King had the right of possession and control at the time he turned 18. And again, that circles back to the whole issue that we've discussed, and Judge Joe Flatt and I have gone back and forth. But apart from that, there are no damages from the failure of duty to disclose. So looking back at the amended complaint, we have a first cause of action for conversion, second cause of action, the breach of trust. And it appears that the plaintiff has alleged, the appellant has alleged, the defendant has breached his duty to preserve those funds for the benefit of the plaintiff, defendant has failed and refused to account for those proceeds or to pay the proceeds to the plaintiff. So it appears from the amended complaint that the appellant is simply alleging all of the funds should have been turned over at some point to his client, that none of them should have been used for the benefit. Is that? Your Honor, it's hard for us to say, we took the position and we read it, we did discovery based on the fact that, did we use the funds properly? And did we, there was not a question or assertion that we had to hold all the funds in trust until he was 18. We treated it as, did we use it properly for his benefit? Because that's what we understood the express terms of the trust to be. So that's what we did. And I will go back to the duty to disclose, the failure to provide the duty to disclose, we think doesn't lead to damages because the failure of the duty to disclose gives the trust, the beneficiary of the knowledge, but the knowledge alone doesn't give the ability to change the terms of the trust. So even if Elkin Simpson knew about it, he couldn't go and demand that I want my money at 16, I want my money at 14, or I wanna use it for my trip to Cancun. The terms of the trust were what dictated, and so the knowledge of the failure to disclose didn't lead to any damages. And in the case of Connor v. Hart, cited in the briefs, 2001 Georgia Appellate Court stands for that proposition. There, the defendant allegedly breached the duty to disclose information relating to a partnership involving a sale, a sale that was not completed. So even though there was a breach of the duty, there were no damages flowing from that breach because the sale was not consummated here, no damages, the funds were always used for Elkin King's benefit. So for all those reasons, we think the facts are not in dispute, or cannot be fairly disputed, there's a genuine issue of material dispute that my client and Ms. Fulford used the funds properly. If Ms. Fulford did not use those, that does not incur a liability to my client under Georgia law or under the terms of the trust. I see my time has expired. I appreciate your honest comment. Thank you, Mr. Fackler. And Mr. Anderson, you've reserved some time for rebuttal. Thank you. One of the things I'd like to point out to the court is that the amended complaint, in this case, actually does refer to the concealment of the funds, i.e. the failure to disclose the funds to Elkin King. The paragraph 14 of the complaint is under the subheading, Defendant's Concealment and Conversion of Proceeds of King's Settlement Intended for Plaintiff's Benefit. That's what the heading is, right above paragraph 14. And in paragraph 14, it describes how Elkin King first learned of the funds how he knew nothing of the settlement, and that plaintiff, that... In my view, the duty to disclose is kind of irrelevant. I'll explain why. If you disclose, the beneficiary now can say, well, I want money. Yes, Your Honor. If you don't disclose, the beneficiary can't say anything. Correct. You're back at square one, and the question becomes whether the fiduciary has an obligation under Georgia law when he becomes an adult to turn over the money. I'm kind of looking at it very simplistically that way. And I think the obligation to turn over the money is because the only right that Peggy King, the only right Glover McGee ever had, to give the money to Peggy King and to Dr. King was because Elkin was a minor. Elkin was Glover McGee's client. Elkin, Glover could not give the money to an 11-year-old child at that point. The only thing he could do at that point, or what he did, I won't say the only thing he could do, he could have appointed a guardian ad litem, he could have done other things, but what he did was he gave the money to Peggy King and to Dr. King. And there's testimony that the check was written out to both of them. And the testimony of Peggy King is that it was given to Dr. King because he was believed to be a stable person who would be responsible for the funds. So the only reason he was ever given the money was because he was a minor. And after he ceased to be a minor, there was no further right to retain those funds. There's been discussion and argument about the terms of a trust. There's no trust document here. All we know is that Glover McGee gave a check payable to Dr. King and Ms. King for the proceeds of the settlement. We really don't even know the proceeds other than the fact that it's admitted that it was at least a net of $200,000. And you're not conceding that any of that amount, the $200,000, was properly spent for Elkin King's benefit. Is that right? Your Honor, we're not conceding that because we don't have any evidence of it other than these interrogatory answers that outline and tabulate the claimed expenditures. And even regardless of whether we conceded, even looking at that tabulation of the expenditures, they raise genuine issues of material fact. There's no foundation for those amounts in that tabulation. They're incredibly round numbers, 10,000 for this, 20,000 for that. There's an entry in there for general upkeep of $75,000 for the years between the time when he got the settlement when he was 11 and the time he was 18. In that seven years, there's a claim of $75,000 spent for general upkeep when in fact, Ms. King was sending the Social Security checks to the maternal grandmother so that they could use that for Elkin's care while he was living in New Orleans. So, Your Honor, number one, we don't concede it, but even if they're entitled to a credit for it, there are genuine issues of material fact as to the amounts that were actually spent. And coming back, I think, Judge Branch, to your question earlier, is there a way to figure out how much money was left in that account when he was 18? We subpoenaed the Charles Schwab accounts. They don't exist any longer. By looking at the tabulation, looking at the plaintiff's own tabulation, the total amount that they claim was spent before he graduated from high school, i.e., he was 18 when he was a senior at North Springs High School. The total amount claimed to have been spent is $158,000. There's at least $42,000 in the account when he turned 18. That's just doing the math that way. Another way to do the math is to say, okay, let's see how much money they claim they spent on him after he turned 18. Well, if you do that math, even setting aside the $50,000 that we know was left over for the condominium, they spent another $174,700. Now, again, these numbers include things like cars that were traded in, and if you buy one car and then the next one is traded in, but then they claim the full amount of that car. And even the third car, the BMW was taken. Dr. King concedes that he got the BMW back. Elkin didn't keep the BMW. So, again, we think there are genuine issues of material fact as to whether these amounts were actually spent on Elkin. And when you do the math, they don't come up to what the district court concluded vastly exceeded the amounts that were received. We don't know how much income that account, we don't know how the funds were invested. We know Dr. King said he put them in a money market account. And, you know, we're talking about years and years of growth of income in that Charles Schwab account, but we have no way of knowing specifically how much that was. So, again, coming back to the question of could they have kept the funds after he was 18? There was never any right to keep the funds after 18. Georgia law only put them in a position of being a fiduciary because he was a minor. And when he no longer became a minor, had he known about the funds, he could have said, these are my funds, I will take control of these funds. He could have, for example, seven years later, when the condominium was going to be purchased, said, I don't think I want to, I've only got $50,000 left in this account, I don't think I want to buy a condominium for that. Or if the condominium had been purchased, the condominium later was foreclosed upon. He could have tried to refinance it, he could have tried to sell it, he could have done something to try to preserve and avoid the waste of those remaining funds, but he didn't know about it at that point. And so that's why the disclosure is so critical. And there simply are not terms of trust in this case. It just doesn't exist. The existence of the fiduciary relationship is because Dr. King took the funds as a custodian for a minor. That's all there was to it. That's the full extent of his right to control those funds. For whatever reason, Dr. King and Ms. King did not disclose those funds to Elkin King, and he only learned about it many years later, and that's why we're here today. Thank you. Thank you, Mr. Anderson. Thank you. Next case.